| | |
|---|---|
| BRENDA LYNN GEIGER, CARISSA ROSARIO, TARA LEIGH PATRICK a/k/a CARMEN ELECTRA, JESSICA HINTON a/k/a JESSA HINTON, CORA SKINNER, DESSIE MITCHESON, HILLARY FISHER VINSON a/k/a HILLARY HEPNER, JAMIE EASON MIDDLETON, INA SCHNITZER a/k/a JORDAN CARVER, LUCY PINDER, MEGAN DANIELS a/k/a MEGAN VOGT, and VIDA GUERRA, *Plaintiffs*, v. C&G OF GROTON, INC. d/b/a MYNX GROTON, SERVICE ROAD CORPORATION d/b/a MYNX HARTFORD, and ALFRED CIRALDO *Defendants.* | No. 3:19-cv-502 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Brenda Lynn Geiger, Carissa Rosario, Tara Leigh Patrick a/k/a Carmen Electra, Jessica Hinton a/k/a Jessa Hinton, Cora Skinner, Dessie Mitcheson, Hillary Fisher Vinson a/k/a Hillary Hepner, Jamie Eason Middleton, Ina Schnitzer a/k/a Jordan Carver, Lucy Pinder, Megan Daniels a/k/a Megan Vogt, and Vida Guerra (collectively "Plaintiffs") have sued C&G of Groton, Inc. ("Mynx Groton"), Service Road Corporation ("Mynx Hartford") (collectively the "Clubs"), and Alfred Ciraldo (collectively "Defendants") for allegedly violating the Lanham Act and a myriad of state law claims over the misappropriation and nonconsensual use of Plaintiffs' photographs.

For the following reasons, the motion to dismiss is **GRANTED in part** and **DENIED in part**.

1

Defendants' motion to dismiss is denied as to Plaintiffs' claims for false advertising, right to privacy – false light, CUTPA, defamation, and negligence. Those claims will proceed. Defendants' motion to dismiss is granted as to Plaintiffs' claims for conversion and quantum meruit.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

Each Plaintiff allegedly "is a well-known professional model who earns her livelihood modeling and licensing" her image for the purpose of advertising products and services. Compl. ¶ 24. Their modeling careers allegedly depend on "their good will and reputation, which is critical in order to maximize their earning potential, book modeling contracts, and establish each of their individual brands." *Id*. ¶ 25. Each Plaintiff allegedly is selective about the companies or brands for which they model. *Id*.

Mynx Groton and/or Mynx Hartford allegedly misappropriated each Plaintiffs' image and allegedly intentionally altered each Plaintiffs' image to advertise their association, affiliation, or endorsement of their businesses. *Id*. ¶ 26. Allegedly, the appearance of every Plaintiff was false. *Id*. ¶ 27.  Nor did any Plaintiffs allegedly know of, consent to, authorize, or receive remuneration for the allegedly improper and illegal use of their images. *Id*. ¶ 28.  In some instances, Defendants allegedly "misappropriated Plaintiffs' advertising ideas because the [i]mages they misappropriated [came] from Plaintiffs' own social media pages[.]" *Id*. ¶ 29.

The Plaintiffs are and more specifically allege the following:

Brenda Lynn Geiger allegedly has performed in the "Ms. Officer" music video with rapper Lil Wayne, worked for the magazine *Glamour*, and appeared on The Howard Stern Show in a Miss HTV March contest. *Id*. ¶ 30. Numerous men's magazines allegedly featured Ms. Geiger and she allegedly has participated in numerous product campaigns. *Id*.

Plaintiffs' Exhibit A allegedly depicts Ms. Geiger in photos posted on the Mynx Groton or Mynx Hartford website. *Id*. ¶ 31; see also Pls.' Ex. A – Geiger, ECF No. 1-1 (Apr. 3, 2019) ("Geiger Photos"). The pictures allegedly are altered "to make it appear that [Ms.] Geiger was either a stripper working at Mynx Groton and/or Mynx Hartford, that she endorsed the Clubs, or that she was otherwise associated or affiliated with the Clubs." Compl. ¶ 31. Ms. Geiger allegedly has never been to nor associated with either Club. Id. The unauthorized use of her image allegedly caused her to suffer, and will continue to cause her to suffer, damages. *Id*. ¶ 32.

Carissa Rosario, allegedly internationally known with a very strong social media presence, has appeared in men's magazines, commercials for nationally-known beverage brands, and owns a perfume line. *Id*. ¶ 33.

Plaintiffs' Exhibit B allegedly depicts Ms. Rosario in photos posted on the Mynx Groton and Mynx Hartford Facebook page. *Id*. ¶ 34. The pictures are allegedly "altered to make it appear that [Ms.] Rosario was either a stripper working at Mynx Groton and/or Mynx Hartford, that she endorsed the Clubs, or that she was otherwise associated or affiliated with the Clubs." *Id*.; *see also* Pls.' Ex. B – Rosario, ECF No. 1-2 (Apr. 3, 2019) ("Rosario Photos"). Ms. Rosario has never been to, associated with, affiliated with, or hired to endorse either Club. Compl. ¶ 35. Ms. Rosario allegedly has not received remuneration for the "unauthorized use of her [i]mage[;]" she has suffered and will continue to suffer damages. *Id*.

Tara Leigh Patrick a/k/a Carmen Electra allegedly "is a world famous actress, recording artist, and entrepreneur," with a substantial social media presence. *Id*. ¶ 36. First allegedly signed by the late recording artist Prince, who produced her first album, Ms. Electra allegedly has had a music career and also appeared in television shows, including as the host of WEtv's reality docu-series *Ex Isle*, and movies.

Plaintiffs' Exhibit C allegedly depicts Ms. Electra in photos posted on the Mynx Groton and Mynx Hartford Facebook page. *Id*. ¶ 37; *see also* Pls.' Ex. C – Electra, ECF No. 1-3 (Apr. 3, 2019) ("Electra Photos"). The pictures are allegedly "altered to make it appear that [Ms.] Electra was either a stripper working at [the Clubs], that she endorsed the Clubs, or that she was otherwise associated or affiliated with the Clubs." *Id*. ¶ 37. Ms. Electra allegedly has never worked at, been associated or affiliated with, or hired to endorse either Mynx Groton or Mynx Hartford. *Id*. ¶ 38. She allegedly has never received payment for the unauthorized use of her image and allegedly has suffered, and will continue to suffer, damages as a result. *Id*.

Jessica Hinton a/k/a Jess Hinton allegedly "is a world renowned and highly sought after model," who has appeared in Playboy. *Id*. ¶ 39. She allegedly has "appeared in countless national commercial [campaigns] and television shows." *Id*. Because of her advertising and promotional work, allegedly "[h]er images have likewise appeared on countless billboards, magazines, posters, and multiple forms of electronic media." *Id*. Finally, she allegedly maintains "elite status as a social media celebrity[.]" *Id*.

Plaintiffs' Exhibit D allegedly depicts Ms. Hinton in photos posted on the Mynx Groton and Mynx Hartford Facebook page. *Id*. ¶ 40; Pls.' Ex. D – Hinton, ECF No. 1-4 (Apr. 3, 2019) ("Hinton Photos"). In the pictures, Ms. Hinton allegedly appears to work as a stripper for the Clubs, endorse the Clubs, or otherwise associate with the Clubs. Compl. ¶ 40.

Ms. Hinton allegedly never received payment for the unauthorized use of her image, has suffered, and allegedly will continue to suffer, damages as a result. *Id*. ¶ 41.

Cora Skinner is allegedly an actress and a model for "a variety of internationally known brands[.]" *Id*. ¶ 42. She allegedly has appeared in *Maxim*, *Playboy*, and "has her own set of Bench Warmer trading cards." *Id*.

Plaintiffs' Exhibit E allegedly depicts Ms. Skinner in photos posted on the Mynx Groton and Mynx Hartford Facebook page. *Id.* ¶ 43; Pls.' Ex. E – Skinner, ECF No. 1-5 (Apr. 3, 2019) ("Skinner Photo"). In the pictures, Ms. Skinner allegedly appears to work as a stripper, endorse the Clubs, or otherwise maintains an association or affiliation with the Clubs. Compl. ¶ 44. She allegedly has never been employed at either Club, associated or affiliated with either Club, and never received payment for the unauthorized use of her image. *Id.* ¶ 44. As a result, Ms. Skinner allegedly has suffered damages and will continue to suffer damages. *Id.*

Dessie Mitcheson allegedly is a professional model and actress. *Id.* ¶ 45. She allegedly has been the face of Playboy Intimates, MGM Grand Las Vegas, and Miss Pennsylvania Intercontinental. *Id.* Ms. Mitcheson allegedly has appeared in *Maxim* and "was featured as the main Tecate Beer ring girl in the biggest Pay-Per-View event in history," which created a huge demand for her services "and increased her daily quote substantially." *Id.* She allegedly has worked in a variety of national advertising campaigns. *Id.*

Plaintiffs' Exhibit F allegedly depicts Ms. Mitcheson in photos posted on the Mynx Groton and Mynx Hartford Facebook page. *Id.* ¶ 46; Pls.' Ex. F – Mitcheson, ECF No. 1-6 (Apr. 3, 2019) ("Mitcheson Photos"). The picture allegedly is altered "to make it appear that [Ms.] Mitcheson was either a stripper working at Mynx Groton and/or Mynx Hartford, that she endorsed the Clubs, or that she was otherwise associated or affiliated with the Clubs." *Id.* Ms. Mitcheson allegedly has never been affiliated or associated with either Club, employed by either Club, or paid by either Club for the allegedly unauthorized use of her picture. Compl. ¶ 47. She allegedly has suffered damages and will continue to suffer damages as a result. *Id.*

Hillary Fisher Vinson a/k/a Hillary Hepner allegedly is a model who earned the title of Miss *Playboy* Club of the Year in 2011 and allegedly served as "the face of *Playboy Intimates* in

2010." *Id.* ¶ 48. She allegedly has modeled for a variety of companies in calendars and advertisements. *Id.* ¶ 49.

Plaintiffs' Exhibit G depicts Ms. Hepner in photos allegedly published on the Mynx Groton and Mynx Hartford Facebook page. *Id.*; Pls.' Ex. G – Hepner, ECF No.1-7 (Apr. 3, 2019) ("Hepner Photos"). The photos allegedly are designed to promote Ms. Hepner's association with Clubs—that she worked as a stripper working there, endorses the Clubs, or is affiliated with the Clubs. *Id.* Ms. Hepner, however, allegedly has "never been associated or affiliated with Mynx Groton or Mynx Hartford, has never been hired to endorse Mynx Groton or Mynx Hartford, [and] has received no remuneration for Defendants' unauthorized use of her [i]mage[.]" Compl. ¶ 50.

Jaime Eason Middleton allegedly "is an American model, fitness model, businesswoman, nutritionist and spokeswoman." *Id.* ¶ 51. She previously was employed as an NFL cheerleader and allegedly won "The World's Fittest Model Competition." *Id.* She allegedly has appeared on the cover of many magazines, "is currently a full-time spokesperson for Bodybuilding.com . . . [,]" and maintains a swimwear line. She allegedly maintains a large social media presence. *Id.*

Plaintiffs' Exhibit H allegedly depicts Ms. Middleton in photos which were published on the Mynx Groton and Mynx Hartford Facebook page. *Id.* ¶ 52; Pls.' Ex. H – Middleton, ECF No. 1-8 (Apr. 3, 2019) ("Middleton Photos"). Ms. Middleton, however allegedly has never worked at, been associated or affiliated with either Club, nor received remuneration for the allegedly unauthorized use of her photo. Compl. ¶ 53. As a result, she allegedly has suffered damages and will continue to suffer damages. *Id.*

Ina Schnitzer a/k/a Jordan Carver allegedly is a model and actress, "spokeswoman for German consumer electronics Redcoon, and has set a record by appear[ing] on the cover of

Britain's *Zoo Magazine* six (6) times." *Id.* ¶ 54. She allegedly has won modeling contests and maintains a substantial social media presence. *Id.*

Plaintiffs' Exhibit I allegedly depicts photos of Ms. Carver posted on the Mynx Groton or Mynx Hartford Facebook page. *Id.* ¶ 55; Ps.' Ex. I – Carver, ECF No.1-9 (Apr. 3, 2019) ("Carver Photos"). The photos allegedly make it appear like Ms. Carver worked as a stripper at one of the Clubs, that she endorsed the Clubs, or maintained some degree of association or affiliation with the Clubs. Compl. ¶ 55. Ms. Carver, however, allegedly has never worked for either Club, associated with either Club, or compensated for the unauthorized use of her image by either Club. *Id.* ¶ 56. She alleged has suffered damages and will continue to suffer damages. *Id.*

Lucy Pinder allegedly is "an English model, actress, host, businesswoman, and one of Great Britain's most famous glamour models." *Id.* ¶ 57. She allegedly has appeared in countless magazines and has a developing acting career, appearing in TV shows and films. *Id.*

Plaintiffs' Exhibit J allegedly depicts photos of Ms. Carver posted on the Mynx Groton or Mynx Hartford Facebook page. *Id.* ¶ 58; Pls.' Ex. J – Pinder, ECF No. 1-10 (Apr. 3, 2019) ("Carver Photos"). The photo was allegedly "intentionally altered to make it appear that [Ms.] Pinder was either a stripper working at Mynx Groton or Mynx Hartford, that she endorsed the Clubs, or that she was otherwise associated or affiliated with the Clubs." Compl. ¶ 58. Ms. Pinder, however, has never worked at, been associated or affiliated with, or received payment for the allegedly unauthorized use of her image. *Id.* ¶ 59. She allegedly has suffered damages and will continue to suffer damages. *Id.*

Megan Daniels a/k/a Megan Vogt allegedly "is an International DJ and model." *Id.* ¶ 60. She has worked in a variety of advertisement campaigns and appeared on the cover of many

magazines. *Id.* She has toured extensively, domestically and internationally, as a DJ and has headlined major music festivals. *Id.*

Plaintiffs' Exhibit K allegedly depicts photos of Ms. Daniels posted on the Mynx Groton or Mynx Hartford Facebook page. *Id.* ¶ 61. The photo allegedly was altered "to make it appear that [Ms.] Daniels was either a stripper working at Mynx Groton and/or Mynx Hartford, that she endorsed the Clubs, or that she was otherwise associated or affiliated with the Clubs." *Id.*; Pls.' Ex. K – Daniels, ECF No.1-11 (Apr. 3, 2019) ("Daniels Photos"). Ms. Daniels, however, allegedly has never been employed at, associated with, affiliated with, or endorsed either Club. Compl. ¶ 62. Furthermore, Ms. Daniels allegedly "has received no remuneration for Defendants' unauthorized use of her [i]mage" and has suffered damages, and will continue to suffer damages, as a result. *Id.*

Vida Guerra allegedly works as an actress and model. *Id.* ¶ 63. She allegedly has received awards as a model and appeared in music videos for artists like Kanye West and Nelly. *Id.* In addition to these appearances, Ms. Guerra allegedly has posed in various magazines, "made multiple appearances on several Spanish language television programs," participated in commercials for various companies, and appeared in a video game. *Id.* She also allegedly produced her own swimsuit calendars. *Id.* Finally, Ms. Guerra is allegedly "in high demand as a spokeswoman for fitness equipment, and in television shows and movies, and has over 577,000 [I]nstagram followers." *Id.*

Plaintiffs' Exhibit L allegedly depicts photos of Ms. Guerra posted on the Mynx Groton or Mynx Hartford Facebook page. *Id.* ¶ 64; Pls.' Ex. L – Guerra, ECF No. 1-12 (Apr. 3, 2019) ("Guerra Photos"). The photos allegedly were altered to make it appear Ms. Guerra worked at Mynx Groton or Mynx Hartford, endorsed either Club, or was somehow otherwise affiliated or

associated with either Club. Compl. ¶ 64. Ms. Guerra, however, allegedly has never maintained an association or affiliation with either Club and has never been paid by either Club for the use of her picture. *Id*. As a result, Ms. Guerra allegedly has suffered and will continue to suffer damages.

The Defendants allegedly engage "in the business of selling alcohol and food in an atmosphere were [sic] nude and/or semi-nude women entertain the business' clientele" and operate the social media accounts associated with each club. *Id*. ¶¶ 66-67. The social media accounts, including Facebook, Twitter, and Instagram, allegedly promote Mynx Hartford and Mynx Groton and attract clients. *Id*. ¶ 68. The use, advertising, creating, printing, and distributing of each Plaintiffs' image allegedly "created the false impression with potential clientele that each Plaintiff either worked as a stripperat Mynx Groton and Mynx Hartford, that she endorsed the Club, or that she was otherwise associated or affiliated with the Club." *Id*. ¶ 70. The promotion and use of Plaintiffs' images allegedly benefitted Defendants through things like monetary payments, increased promotional advertising, marketing, notoriety, publicity, business revenue, profits, proceeds, and income. *Id*. ¶ 71.

Plaintiffs further allege that Defendants "were at all times aware" that none of the Plaintiffs have ever been affiliated with, employed by, or associated with either club. *Id*. ¶ 72. The use of all of their photos were allegedly misappropriations of the Plaintiffs' images and "done without the knowledge or consent of Plaintiffs" or compensation. *Id*. ¶ 73.

Within the modeling industry, there is allegedly a "particularized method and process" used to hire a model. *Id*. ¶ 75. Professional model fees allegedly involve consideration of: "a) the reputation, earning capacity, experience, and demand of that particular model; b) the location where the photo shoot takes place, and the length thereof; c) where and how the images are going

to be used by the client (*e.g.*, company website, social media, television commercials, billboards or posters), known as 'usage'; and, d) the length of time (known as the 'term') the rights to use the photos will be assigned." *Id*. ¶ 76. One, two, or three-year terms are allegedly typical, but rarely last a lifetime. *Id*.

Defendants allegedly "knowingly, and without the prior consent of any of the Plaintiffs, invaded Plaintiffs' privacy by using Plaintiffs' [i]mages for commercial purposes" and to promote their businesses. *Id*. ¶ 77. The images allegedly were used as marketing and promotional materials on the Clubs' website, Twitter, Facebook, and Instagram. The images posted on the Clubs' social media pages allegedly created "the false impression that Plaintiffs worked at Mynx Groton and Mynx Hartford, endorsed, promoted or sponsored same, or were otherwise associated or affiliated with same." *Id*. ¶ 78. The images allegedly were used to attract clients, and thus, business revenue. *Id*. ¶ 79.

The unauthorized use allegedly violated "Plaintiffs' right to privacy, Plaintiffs' right of publicity, and creat[ed] a false impression to potential customers that Plaintiffs worked at and/or endorsed Mynx Groton and Mynx Hartford." *Id*. ¶ 80. The unauthorized use allegedly deprived Plaintiffs "of income they are owed relating to the commercialization of their [i]mages" and "substantially injures [the Plaintiffs'] careers." *Id*. ¶ 81-82.

### B. Procedural History

On April 3, 2019, Dessie Mitcheson, Megan Daniels, Tara Leigh Patrick, Hillary Fisher Vinson, Ina Schnitzer, Carissa Rosario, Vida Guerra, Jamie Eason Middleton, Brenda Lynn Geiger, Jessica Hinton, Lucy Pinder, and Cora Skinner ("Plaintiffs") filed their Complaint. Compl., ECF No. 1 (Apr. 3, 2019).

On July 11, 2019, the Court held a telephonic scheduling conference. Minute Entry, ECF No. 25 (July 11, 2019). The Court subsequently issued an initial scheduling order. Initial Scheduling Order, ECF No. 26 (July 11, 2019).

On July 22, 2019, Plaintiffs filed an Amended Complaint against Defendants. Amended Compl., ECF No. 28 (July 22, 2019) ("Am. Compl.").

On July 31, 2019, Plaintiffs filed a Second Amended Complaint against Defendants. Second Amended Compl., ECF No. 30 (July 31, 2019) ("Compl.").

On August 2, 2019, Defendants filed a third-party complaint against Perfekta Creative Corporation. Third-Party Compl., ECF No. 31 (Aug. 2, 2019).

On August 14, 2019, Defendants filed a motion to dismiss the first, fourth, fifth, sixth, seventh, eighth, and tenth causes of action in Plaintiffs' Second Amended Complaint. Mot. to Dismiss, ECF No. 34 (Aug. 14, 2019) ("Mot. to Dismiss"); see also Mem. in Support, ECF No. 35 (Aug. 14, 2019) ("Defs.' Mem.").

On September 4, 2019, Plaintiffs filed a memorandum in opposition to Defendant's motion to dismiss. Mem. in Opp., ECF No. 38 (Sept. 4, 2019) ("Pls.' Opp.").

On October 11, 2019, Defendants filed a stipulation for an extension of time until November 19, 2019, to respond or object to Plaintiffs' discovery requests. Stipulation, ECF No. 40 (Oct. 11, 2019). An amended stipulation was filed the same day. Am. Stipulation, ECF No. 41 (Oct. 11, 2019).

On December 9, 2019 the Court held a motion hearing on Defendants' motion to dismiss. Minute Entry, ECF No. 45 (Dec. 9, 2019).

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), a court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. A court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

### A. Lanham Act – False Advertising

The Lanham Act authorizes civil action against:

> (1) [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . .

by any person "who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(A)-(B). This section creates "two distinct bases of liability: false association and false advertising." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Because Defendants' only moved to dismiss Plaintiffs' claims under the false advertising subsection, the Court will only discuss § 1125(a)(1)(B).

False advertising claims contain two components. "First (and obviously), a plaintiff bringing a false advertising claim must show falsity," *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016), either by demonstrating a challenged advertisement is false on its face or that the advertisement, "'while not literally false, is nevertheless likely to mislead or confuse consumers [,]'" *id.* (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)). Second, a plaintiff "'must also demonstrate that the false or misleading representation involved an inherent or material quality of the product." *Id.* (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 n.3 (2d Cir. 1999)). "When an advertisement is false on its face or false by necessary implication, a court may grant relief 'without reference to the advertisement's actual impact on the buying public' because consumer confusion is presumed." *Playtex Products, LLC v. Munchkin, Inc.*, No. 14-cv-1308 (RJS), 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016) (quoting *Time Warner Cable, Inc.*, 497 F.3d at 153). To qualify as false or false by necessary implication, the message must be unambiguous. *Time Warner Cable, Inc.* v. 497 F.3d at 158.

In order to assert a false advertising claim, Plaintiffs must have standing both under Article III and the Lanham Act. Under Article III, a "plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark*, 572 U.S. at 125 (citations omitted). *Lexmark* clarified that statutory standing requires a plaintiff's injury to fall within the "zone of interests" protected by the statute, *id.* at 126, and that "violations of the statute" proximately caused a plaintiff's injury, *id.* at 132.

Under 15 U.S.C. § 1125(a)(1), an injury within the zone of interests includes "an injury to a commercial interest in reputation or sales." *Id.* at 131-32. Proximate cause includes

"economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. Plaintiff and defendant need not be competitors for a plaintiff to have standing. *Id.* at 136.

Finally,

> To prevail on a claim for false advertising, a plaintiff must prove the following elements: (1) "the challenged advertisement is false"; (2) the misrepresentation was material because it relates to "an inherent quality or characteristic of the product" and, therefore, affects a consumer's purchasing decision; (3) "the defendant placed the false or misleading statement in interstate commerce"; and (4) the plaintiff has been injured by the misrepresentation, "either by direct diversion of sales or by a lessening of goodwill associated with its products."

*Playtex Products,* 2016 WL 1276450 at *3 (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)).

Falsity requires establishing "that the advertisement either makes an express statement that is false or a statement is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (quoting *Time Warner Cable, Inc.*, 497 F.3d at 158); *see also Time Warner Cable, Inc.*, 497 F.3d at 148 ("[A]n advertisement can be literally false even though it does not explicitly make a false assertion, if the words or images, considered in context, necessarily and unambiguously imply a false message."). The ambiguity of the advertisement determines whether the advertisement can be literally false or impliedly false. *Id.* If unambiguous, the advertisement is literally false; if ambiguous, "a plaintiff may nonetheless demonstrate that it is

impliedly false if the message leaves 'an impression on the listener or viewer that conflicts with reality." *Id*. (quoting *Time Warner Cable*, 497 F.3d at 153)).

Defendants argue Plaintiffs insufficiently pled "that they have suffered injuries of a nature that are within the 'zone of interests' which are intended to be protected" through a false advertising claim and "that consumer deception caused by Defendants' allegedly false advertisements [were] the proximate cause of alleged economic and reputational injuries to Plaintiffs." Defs.' Mem. at 5. Specifically, Plaintiffs' claim must be dismissed because there are no allegations of the nature of damages caused by the allegedly false advertisements, *id*. at 8-9, and no allegations that "allegedly false advertisements were a proximate cause of injury to Plaintiffs' business reputations or injury to present and future sales of Plaintiffs' modeling services and/or licensing of their images to third-party customers[,]" *id*. at 9.

Plaintiffs argue they would have been paid but for the "illicit advertising scheme" used by the Defendants. Pls.' Opp. at 3. In their view, affiliation "with Defendants' strip clubs has harmed their brand and their commercial interests because commercial clients will be less likely to hire Plaintiffs to promote and endorse their products . . ." *Id*. Plaintiffs believe that "the very purpose of Defendants' marketing scheme was to confuse consumers as to the fact Plaintiffs were strippers at their strip club . . . and thus increase their revenue." *Id*. at 4. To have standing under this provision of the Lanham Act, "Plaintiffs need not allege they were commercially harmed because <u>Defendant's customers</u> did not subsequently hire them for modeling jobs; they only need allege an injury to a commercial interest." *Id*. (emphasis in original).

The Court agrees.

Plaintiffs have alleged an injury that has already occurred, damaged their reputation, and allegedly stemmed from the Defendants' alleged misappropriation of their images and photos, an

injury which could be remedied through the awarding of damages. Compl. ¶¶ 28, 100, 131-37, 149-50, 160-63, 169-70. These alleged injuries fall within the "zone of interests" covered by the Lanham Act. *See Lexmark*, 572 U.S. at 133 ("The relevant question is not whether plaintiff's interest is 'reasonable,' but whether it is one the Lanham Act protects; and not whether there is a 'reasonable basis' for the plaintiff's claim of harm, but whether the harm alleged is proximately tied to the defendant's conduct.").

Moreover, Plaintiffs adequately allege that the challenged advertisements are false because of the allegedly inappropriate association between the Clubs and the Plaintiffs that the advertisements evoke. The advertisements, if not literally false, as alleged, could be impliedly false—creating a "message [that] means something different from what reasonable consumers would understand it to mean[.]" *Church & Dwight Co., Inc.*, 843 F.3d at 66. While "images cannot be vague or broad . . . and can [ ] 'be proven either true or false,'" an image or visual representation may be "so grossly exaggerated that no reasonable buyer would take it at face value[.]" *Time Warner Cable, Inc.*, 497 F.3d at 160 (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)). At this stage in the proceedings, the Court need not determine the falsity, and whether it is literal or implied. It is sufficient that Plaintiffs have plausibly alleged how the images may be false.

Plaintiffs also have adequately alleged that the misappropriated material affected their personal brands and future employment activities. *See Merck Eprova AG*, 760 F.3d at 255 (describing a material misrepresentation as one that speaks to "an inherent quality or characteristic of the product"); *see also Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129 (2d Cir. 1994) (describing materiality as "deception . . . that is likely to influence purchasing decisions"). Plaintiffs have

alleged that the photos infringe on their personal brand, and so infringe a material part of their product. Plaintiffs have adequately claimed that association with these Clubs can affect future employment opportunities.

Plaintiffs also adequately allege that Defendants published the alleged false advertisements, thus putting them into interstate commerce. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 201, 211 (2d Cir. 2013) (in an action claiming dilution of brand, the court described something "in commerce" "as when a mark is viewed on packaging" and referred to an item's "presentation in the marketplace"). Alleging the images were posted on social media adequately alleges that the Defendants put the images into interstate commerce.

Lastly, Plaintiffs allege injury because of the misrepresentation. In *Lexmark*, the Supreme Court found that "allegations of lost sales and damage to" business reputation satisfied the "injury in fact" prong of Article III standing requirements. *Lexmark*, 572 U.S. at 125.

As the Supreme Court made clear in *Lexmark*: "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 140. At this stage of the case, Plaintiffs have met this burden.

Accordingly, Plaintiffs' Lanham Act claim will not be dismissed.

**B. Right of Privacy – False Light**

The Connecticut Supreme Court recognizes four types of invasion of privacy:

> (1) appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's physical solitude or seclusion; (3) publicity, of a highly objectionable kind, given to private information about the plaintiff even though it is true and no action would lie for defamation; and (4) publicity which places the plaintiff in a false light in the public eye.

*Honan v. Dimyan*, 52 Conn. App. 123, 132 (Conn. App. Ct. 1999) (quoting *Venturi v. Savitt, Inc.*, 191 Conn. 588, 591 n.1 (Conn. 1983)).

Establishing an invasion of privacy by false light requires Plaintiffs to show that "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard to the falsity of the publicized matter and the false light in which the other would be placed." *Id*. at 132-33 (internal quotations and citations omitted). "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; and (2) is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position." *Jonap v. Silver*, 1 Conn. App. 440, 558 (Conn. App. Ct. 1984) (internal quotations and citations omitted).

"The 'publicity' associated with invasion of privacy 'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Holmes v. Town of East Lyme*, 866 F. Supp. 2d 108, 131 (D. Conn. Mar. 30, 2012).

Defendants argue Plaintiffs' Second Amended Complaint "fail[s] to allege facts, which, if true, demonstrate that the advertisements which underlie Plaintiffs' claims were given 'publicity' which reached the general public." Defs.' Mem. at 10. While Plaintiffs allege the photos were posted on social media, no allegations spoke to the scale or breadth of the audience "which actually received or became aware of the subject advertisements . . ." *Id*. at 12. To the Defendants, posting does not equate publication. *Id*. at 12-13.

Plaintiffs concur that "'publicity' under this claim 'means that the matter is made public . . . '", Pls.' Opp. at 5 (quoting *Onforio v. Savoy*, 2018 WL 4568410, at *4 (D. Conn. Sept. 24,

2018)), and that standard was met when the advertisements were published worldwide "via the internet[.]" Pls.' Opp. at 5.

The Court agrees.

Connecticut courts have found that "publicity" includes "communication[s] that reach[ ], or [are] sure to reach the public." *Orisini v. Zimmer*, No. CV075013711S, 2009 WL 5698148, *7 (Sup. Ct. J.D. New Haven Dec. 24, 2009). Publication on public, social media websites make it possible that the photos would likely reach the public.[1] *See* Restatement (Second) of Torts § 652D (1977) (In distinguishing "publication" and "publicity," the Restatement found the latter "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference . . . is one of a communication that reaches, or is sure to reach, the public.").

Here, Plaintiffs have sufficiently alleged that the advertisements reached the general public when the photographs were posted on the social media websites Twitter, Facebook, and Instagram and have attached the challenged advertisements to the Complaint, which includes both the social media account and the date the photo was posted. As a result, Plaintiffs' factual allegations in support of its false light invasion of privacy claim are sufficient at this stage of the case.

Accordingly, Plaintiffs' false light invasion of privacy claim will not be dismissed.

---

[1] It is worth noting that higher courts in Connecticut have not ruled on the definition of "publicity" in an action for an invasion of privacy. *See Ramsdell v. Hartford Hosp.*, No. HHDCV176082676S, 2019 WL 659344, at *7 (Conn. Super. Ct. Jan. 14, 2019) ("The Connecticut Supreme Court has approvingly cited the Restatement [of Torts] definition of what constitutes the tort of publicity given to a private life. The Supreme Court has not, however, specifically addressed the parameters of what constitutes 'publicity' as used by the Restatement." (citations omitted)); *Cavallaro v. Rosado*, No. CV054009939, 2006 WL 2949143, at *7 (Conn. Super. Ct. Oct. 5, 2006) ("No Connecticut Appellate Court has decided what constitutes 'publicity' in the context of an action for invasion of privacy.")

## C.  Connecticut Unfair Trade Practices Act ("CUTPA")

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 41-110b(a). It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action to recover actual damages," punitive damages, and equitable relief. Conn. Gen. Stat. § 42-110g(a).

A plaintiff must first prove "that [she] has suffered an ascertainable loss due to a CUTPA violation" before she may seek relief. *Di Teresi v. Stamford Health System, Inc.*, 149 Conn. App. 502, 509 (Conn. App. 2014) (quoting *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217-18 (Conn. 2008)). An ascertainable loss is "capable of being discovered, observed or established[,]" but only requires the loss to be measurable; it does not need to be a precise dollar amount. *Id*. (citation omitted).

In order to prevail on a CUTPA claim, a plaintiff must also "establish both that the defendant has engaged in a prohibited act *and* that, 'as a result of' this act, the plaintiff suffered an injury." *Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 306 (Conn. 1997) (emphasis in original). "As a result of" demands "showing that the prohibited act was the proximate cause of a harm to the plaintiff," *id*., "mere 'but for' causation is not sufficient to support a CUTPA claim," *id*. at 308. Trade or commerce "is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.'" *Fink v. Golenbock*, 238 Conn. 183, 212-13 (Conn. 1996); *see also* Conn. Gen. Stat. § 42-110a(4).

When determining whether a practice violates CUTPA, Connecticut courts consider:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Gaynor v. Hi-Tech Homes*, 149 Conn. App. 267, 275 (2014).

Defendants argue that Plaintiffs' lack standing to bring a CUTPA claim because they fail to demonstrate an ascertainable loss caused by the Defendants' conduct. Defs.' Mem. at 13. They argue that the damages alleged were not pled with particularity, *id*. at 14, and are conclusory allegations "unsupported by specific factual allegations," *id*. at 15. In their view, Plaintiffs allege a harm not foreseeable from Defendants' conduct and, because of that, Plaintiffs must plead "factual allegations which demonstrate the particular events and transactions which create the causal link between Defendants' conduct and the claimed injuries" to reputation or their ability to market themselves as models. *Id*. at 16. As a result, Defendants argue Plaintiffs' CUTPA claims "and corresponding requests for punitive damages, costs and attorney's fees requested" must be dismissed. *Id*. at 17.

Plaintiffs argue that they "lost the amount of money that would have been paid them had Defendants . . . relied on legal channels to hire Plaintiffs to appear in their advertisements, and paid them for said appearances." Pls.' Opp. at 7. In their view, in addition to these monetary losses, Defendants also potentially caused "significant harm to Plaintiffs' careers by harming their commercial prospects with other clients[.]" *Id*. Plaintiffs argue that CUTPA does not require them to list or describe "Mynx Groton and Mynx Hartford customers who actually relied

on Defendants' false representations . . . " *Id*. at 7-8. In their view, because they have adequately

pled loss and Defendants' unfair practices, their claim should not be dismissed. *Id*. 6-7.

The Court agrees.

Plaintiffs pled that their images were misappropriated and used without their permission

by Defendants' in the course of advertising and promotion of Defendant strip clubs. That action

could plausibly constitute unlawful action or could offend an "established concept of

unfairness." *Gaynor*, 149 Conn. at 275. Plaintiffs also have plausibly stated with particularity

that the Defendants posted these advertisements and that these advertisements caused harm or

could cause harm to their professional brands.

While Defendants argue that Plaintiffs' CUTPA claim fails because Plaintiffs describe

the loss suffered broadly as "damages", CUTPA only requires that the loss be ascertainable,

which means "capable of being discovered." *Di Teresi*, 149 Conn. App. at 509. Plaintiffs allege

with specificity factual allegations that put the Defendants on notice as to the nature of their

claims. *See* Compl. ¶ 26 ("Each of the Plaintiffs' [i]mages was misappropriated, and

intentionally altered, by one or more of the Defendants in order to make it appear that they

worked at, endorsed, or were otherwise associated, affiliated, or connected with Mynx Groton

and/or Mynx Hartford."); *id.* ¶ 142 ("Defendants published Plaintiffs' [i]mages on . . . social

media accounts in order to create the false impression that Plaintiffs were either strippers

working at the Club, endorsed the Club, or were otherwise affiliated, associated, or connected

with the Club); *id.* ¶ 145 ("Defendants' advertising practices offends the public policy of

Connecticut insofar as it constitutes misappropriation of Plaintiffs' property rights in their own

[i]mages, and invasion of Plaintiffs' privacy, for Defendants['] commercial benefit."); *id.* ¶ 149

("As a result of Defendants' unauthorized and misleading publication . . . each of the Plaintiffs'

reputations was injured, and each of the Plaintiffs' ability to market herself as a model was injured."). The extent or amount of damage at this time may be unknown, but the determination of the amount of loss is a fact-based inquiry. As a result, dismissal of Plaintiff's claim is not warranted, at least at this time.

Accordingly, the Court will not dismiss Plaintiffs' CUTPA claim.

### D. Defamation

For a plaintiff to establish a prima facie case of defamation, she must demonstrate: "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v. Smolinksi*, 319 Conn. 394, 430 (Conn. 2015) (quoting *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28 (Conn. 2009)). "A defamatory statement is defined as communication that tends to harm the reputation of another as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her] . . . " *Gleason v. Smolinski*, 319 Conn. 394, 430 (Conn. 2015) (quoting *Cwelinsky v. Mobil Chemcial Co.*, 267 Conn. 210, 217 (Conn. 2004)). Defamation may be spoken (slander) or written (libel). *See Cohen v. Meyers*, 175 Conn. App. 519, 544 (Conn. App. Ct. 2017) ("[S]lander is oral defamation and libel is written defamation.")

"A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication . . . Libel per se, on the other hand, is a libel the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of damages." *DeMorais v. Wisniowski*, 81 Conn. App. 595, 603-04 (Conn. App. Ct. 2004) (quoting *Lega Siciliana Social Club, Inc. v. St. Germaine*, 77 Conn. App. 846, 851-52 (Conn. App. Ct. 2003)). If the defamation is libel *per se*, "[a party] may

recover general damages[.]" *Id*. If the defamation is libel *per quod*, a party "must plead and prove actual damages in order to recover." *Id*. (citation omitted); *see also Lowe v. City of Shelton*, 83 Conn. App. 750, 765-66 (Conn. App. Ct. 2004) ("When a plaintiff brings an action in libel per quod, he must plead and prove actual damages in order to recover . . ." (citations omitted)).

According to the Defendants, none of the advertisements "contain [any] statements about any of Plaintiffs which are defamatory on their face." Defs.' Mem. at 17. Because the statements are not defamatory per se, Plaintiffs must, and fail to, "allege the essential elements of a claim for defamation per quod." Defs. Mem. at 17. Specifically, Defendants find Plaintiffs "have alleged neither actual damages to their reputation nor facts that demonstrate [they] have suffered special pecuniary damage as a direct result of Defendants' advertisements," making Plaintiffs' claim legally deficient. *Id*. at 24.

Plaintiffs argue that their portrayal as strippers at Defendants' clubs is "both defamatory (because it was false) and defamatory *per se* (because it could harm their business interests)" and does not require an actual malice inquiry. Pls.' Opp. at 8. While they concede "they are currently not in possession of information relating to Defendants' intentions and calculations relating to their advertising scheme[,]" in their view, Defendants' actions are not "unactionable or protected" because of that, nor should Plaintiffs be prevented from further "inquiry into their false and misleading advertising scheme . . ." *Id*. at 9.

The Court agrees.

Plaintiffs have alleged that (1) Defendants published defamatory statements when they allegedly appropriated Plaintiffs' images for use in their advertisements for their Clubs; (2) their photograph identified Plaintiffs; (3) the allegedly defamatory photographs were published on the

internet through social media websites; and (4) Plaintiffs professional reputations and brands have suffered as a result.

For a statement to be actionable, the statement must be false and that determination of truthfulness is a question of fact not appropriate for resolution at this time. *Cohen*, 175 Conn. App. at 545-46 (finding that, while truth may be an affirmative defense to defamation, "the determination of truthfulness of a statement is [a] question of fact . . ." (citation omitted)); *see also Fountain Pointe, LLC v. Calpitano*, 144 Conn. App. 624, 655 (Conn. App. 2013) ("Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact. . ." (quoting *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 638 (2009)).

Significantly, Connecticut courts have previously found images capable of being defamatory. *See Negron v. Rexam Cosmetic Packaging, Inc.*, No. CV 044000333S, 2006 WL 240528, at *18 (Conn. Super. Ct. Jan. 11, 2006) (finding genuine issues of material facts that prevented the entry of summary judgment where pictures that made it appear the plaintiff had sex with his dog implied the plaintiff engaged in criminal activity and that "a jury *could* reasonably find that all four factors required to establish a prima facie case of defamation are present" (emphasis in the original)).

Because Plaintiffs have adequately pled their defamation claim and because the ultimate question of the veracity of the statements is a question of fact, Plaintiffs' defamation claim will not be dismissed**.**

### E.  Negligence

The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. *PK Constructors, Inc. v. Fusco Corp.*, 231

Conn. 381, 384 (1994). The existence of duty is a question of law. *Id.*; *Gazo v. Stamford*, 255 Conn. 245, 250 (2001). If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant. *Sic v. Nunan*, 307 Conn. 399, 406-07 (2012). Likewise, only if a duty is found to exist will the trier of fact determine whether the duty has been violated. *See Gazo*, 255 Conn. at 250. "The nature of duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." *Bloomfield Health Care Ctr. Of Connecticut, LLC v. Doyon*, 185 Conn. App. 340, 353 (Conn. App. Ct. 2018) (quoting *Munn v. Hotchkiss School*, 325 Conn. 540, 548 (Conn. 2017)).

> The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised . . . [T]he test for the existence of legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate the harm of the general nature that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibilities for its negligent conduct should extend to the particular consequences *or particular plaintiff in the case*.

*Id.* (quoting *Munn*, 216 Conn. at 548) (emphasis in the original). "The circumstances surrounding the conduct of the individual" determine the nature of the duty and to whom it is owed. *Demond v. Project Service, LLC*, 331 Conn. 816, 834 (Conn. 2019) (citations omitted).

Defendants argue that Plaintiffs "attempt to reduce the other tort claims alleged by Plaintiffs in the Complaint, into a claim of negligence" and that the duty of care alleged "has never been recognized by any Connecticut court . . ." Defs.' Mem. at 25. Furthermore, the damages alleged "are purely economic and unaccompanied by any alleged physical injury" which necessitates dismissing the claim. *Id.* at 25.

In their view, permitting the negligence claim to proceed would "allow Plaintiffs to avoid the specific elements of, and defenses to, their other tort claims by re-branding them as [a] claim

of negligence." *Id*. at 29. Moreover, Defendants argue that establishing the duty of care Plaintiffs

desire—"to protect all persons against infringement of their intellectual property and publication

rights"—provides "no additional and greater protection than that which is provided by the

existing statutory and common law rights of action . . . "*Id*. at 30.

Plaintiffs argue that Defendants had a duty "to maintain policies and procedures

governing the use of intellectual property and publicity rights in advertising, and Defendants'

failure to adhere to this duty was the proximate cause of Plaintiffs' damages . . . " Pls.' Opp. at 9.

Plaintiffs also argue that the central issue "is whether it was foreseeable that Defendants [who

chose the images or directed someone to choose the images], could foresee Plaintiffs being

damaged by the subject advertisements." *Id*. at 10. Plaintiffs argue that Connecticut tort law

permits recovery even for economic loss, citing cases "which specifically and clearly held that

'purely economic losses, if reasonably foreseeable, are recoverable against a party even in the

absence of privity.'" *Id*. at 11 (quoting *Coburn v. Lenox Homes, Inc*., 173 Conn. 567 (Conn.

1977)).

The Court agrees, at least for now.

The threshold issue is whether the Defendants have a legal duty to the Plaintiffs.  As the

Connecticut Supreme Court recently affirmed, "the existence of a duty is a question of law and

only if such a duty is found to exist does the trier of fact then determine whether the defendant

[breached] that duty in the particular situation at hand . . . . If a court determines, as a matter of

law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from

the defendant." *Demond*, 331 Conn. at 816 (citations and internal quotation marks omitted).

Connecticut courts have recognized a two-part test for determining a legal duty: (1)

"whether an ordinary person in the defendant's position, knowing what the defendant knew or

should have known, would anticipate the harm of the general nature of that suffered was likely to result;" and (2) "on the basis of a public policy analysis, of whether the defendant's responsibilities for its negligent conduct should extend to the particular consequences *or particular plaintiff in the case*." *Bloomfield Health Care Ctr. of Connecticut, LLC,* 185 Conn. App. at 353 (citations and internal quotations marks omitted) (emphasis in original).

As the Connecticut Appellate Court noted in *Bloomfield Health Care Ctr.*: "when a plaintiff can show that the two requirements for the test of the existence of a legal duty of care have been met, our courts may recognize that the plaintiff can bring an action for negligence against the defendant." *Id.* at 423; *see also Monk v. Temple George Associates, LLC*, 273 Conn. 108, 114 (Conn. 2008) ("The test for determining legal duty is a two-prong analysis that includes: (1) a determination of foreseeability; and (2) public policy analysis." (citation omitted)). Connecticut courts consider four factors when determining whether public policy requires an imposition of duty: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity under review; while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Monk*, 273 Conn. at 118 (citations omitted).

The application of that two-part test here, of foreseeability and public policy necessity, suggests liability could be possible. Certainly, the Defendants knew that the use of Plaintiffs' images may affect the Plaintiffs' reputations; indeed, arguably, Defendants were hoping for some benefit from the public exploitation of the Plaintiffs. Compl. ¶¶ 68-69 (alleging Defendants published Plaintiffs' images on social media for commercial and financial benefit); *id.* ¶ 71 (alleging potential benefits from the alleged illegal use of Plaintiffs' images could include "monetary payments; increased promotional, advertising, marketing, and other public relations

benefits; notoriety; publicity; as well as an increase in business revenue, profits, proceeds and income").

Likewise, given the potential applicability of statutory and common-law protections against the actions alleged to have been undertaken by the Defendants, such as the Lanham Act, false light invasion of privacy, and CUTPA, there may be valid public policy reasons for extending a duty of care in this context. Because further development of the facts during the course of discovery may shed more light on this issue as well as on the issue of foreseeability – these issues need to be resolved on a more complete record, *see Bloomfield Health Care Ctr. of Connecticut, LLC,* 185 Conn. App. at 355 (noting that '[o]rdinarily, 'whether the injury is reasonably foreseeable . . . gives rise to a question of fact for the finder of fact . . . .").  As a result, the Court will not dismiss the claim of negligence now and will wait until after discovery to resolve it.

To the extent that a dispositive motion is filed seeking to dismiss the claim, the Court will be in a better to position after discovery to evaluate and perhaps, definitively rule on this claim, or consider whether it should be certified to the Connecticut Supreme Court for resolution. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."); *see also Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014) (certifying a question to state court where no state's highest court had ruled on the issue and the interpretation could have broader ramifications in the area of law at issue); *Briggs Avenue L.L.C. v. Ins. Corp. of Hanover*, 516 F.3d 42, 46 (2d Cir. 2008) (noting that the Second Circuit has "certified questions to the New York Court of Appeals 'where state law is not clear and state courts have had little opportunity to interpret it'" (citation omitted)); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 152 (2d

Cir. 2001) ("[F]ederal courts ought not to deprive the state courts of the opportunity to construe their own statutes, using the interpretive tools, presumptions, and standards they deem proper.")

Accordingly, Plaintiffs' negligence claim will not be dismissed, at least at this time.

### F. Conversion

"Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418 (Conn. 2007). To prevail on a conversion claim, "the party alleging conversion . . . must prove a sufficient property interest in the items in question." *Id*. at 419. The plaintiff's property rights "have been dealt with in a manner adverse to him, inconsistent with [her] right of dominion and to [her] harm." *Aetna Life & Casualty Co. v. Union Tr. Co.*, 230 Conn. 779, 791 (Conn. 1994) (citation omitted). "In Connecticut, intangible property interests have not traditionally been subject to the tort of conversion, except for those intangible property rights evidenced in a document." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 44 (Conn. 2000).

Defendants argue that Connecticut law does not apply "to purely intangible rights." Defs.' Mem. at 31. In their view, Plaintiffs do not state a legally sufficient claim because "[t]he Plaintiffs' property interests in their 'Images'—namely, images and photos of Plaintiffs, or their likeness, are purely intangible property rights which cannot sustain a claim for conversion under Connecticut law." *Id*. at 33.

Plaintiffs first note that Defendants relied on summary judgment decisions to support "their argument that a conversion claim cannot apply to 'intangible property rights[.]" Pls.' Opp. at 11. Furthermore, it is not the photographs, "but rather each Plaintiffs' likeness and persona," which do not fall within the subject matter of copyright. *Id*. Plaintiffs argue they have a "valid

property interest in [their] persona and likeness," which Defendants "usurped . . . without [their] consent[.]" *Id.* at 12.

The Court disagrees.

Even if Plaintiffs adequately alleged possessing a property right in their image, likeness, or persona, they have inadequately pled a claim for conversion. Plaintiffs admit in their Complaint that the rights to use photos are often assigned, for terms typically from one to three years. Compl. ¶ 76. Presumably if the term has not passed, the owner of the assigned right would be able to bring a conversion claim. Plaintiffs do not allege what happens to the ownership rights after the term passes.

It is plausible that ownership reverts back to the model, but Plaintiffs do not allege that they currently own the images or photographs that Defendants allegedly misappropriated or used without authorization. Furthermore, conversion requires the "unauthorized assumption and exercise of the right of ownership over property belonging to another, *to the exclusion of the owner's rights.*" *Mystic Color Lab, Inc.*, 284 Conn. at 418 (emphasis added). Plaintiffs do not allege that they can no longer use the photographs that were allegedly altered or misappropriated to include advertisements for either strip club.

Because Plaintiffs have not adequately alleged their claim for conversion, the Court will dismiss that claim.[2]

## G. Quantum Meruit

---

[2] A federal district court in Connecticut found that Connecticut courts "recognize[ ] that intangible property interest have not traditionally been subject to conversion." *Eadie v. McMahon*, Nos. 5:91-CV-042 3(WWE), 5:92-CV-0216 (WWE), 1997 WL 289679, at *16 (D. Conn. Mar. 12, 1997). The court therefore granted defendants' motion for summary judgment finding that "no Connecticut case has extended the tort of conversion to intangible interests in and of themselves." *Id*.

Quantum meruit is "the equitable remedy of restitution by which a plaintiff may recover the benefits conferred on a defendant in situations where no express contract has been entered into by the parties. . . . A determination of a quantum meruit claim requires a factual examination of the circumstances and of the conduct of the parties . . ." *Stewart v. King*, 121 Conn. App. 64, 72-73 (Conn. App. Ct. 2010).

Triers of fact are responsible for these factual determinations. *Id*. at 73. If the trier of fact determines "that an implied contract for services existed between the parties," the plaintiff then "is entitled to the reasonable value of services rendered." *Id*. at 74 (quoting *Total Aircraft, LLC v. Nascimento*, 93 Conn. App. 576, 582 n. 5 (Conn. App. Ct. 2006)). "[Q]uantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement." *Gagne v. Vaccaro*, 255 Conn. 390, 401 (2001) (citing *Fischer v. Kennedy*, 106 Conn. 484, 492 (1927)). The implied contract need only be implied in law—"an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation . . . *based on equitable principles* to operate whenever justice requires compensation to be made . . ." *Parnoff v. Mooney*, 132 Conn. App. 512, 519 (Conn. App. Ct. 2011) (quoting *Bershtein, Bershtein & Bershtein, P.C. v. Nemeth*, 221 Conn. 236, 242 (Conn. 1992)). "[I]t becomes necessary in any case where the benefit of the doctrine is claimed to examine the circumstances and the conduct of the parties and apply this standard." *Id*. at 519 (citations omitted).

Defendants argue Plaintiffs have failed to demonstrate "that [they] rendered services to the Defendants, which Defendants knowingly accepted, and thereby impliedly promised to pay Plaintiffs for the services they had rendered." Defs.' Mem. at 33-34.

Plaintiffs respond that Defendants mischaracterize the Complaint. Pls.' Opp. at 12. In their view, Defendant's argument "that they did not 'knowing[ly]' use Plaintiffs' image does not

withstand even minimal scrutiny and is impossible to square with the subject advertisements . . ." *Id*. at 12. Plaintiffs argue that even if Defendants' assertion is true, this is a fact issue and not "grounds to deny Plaintiffs' discovery into this claim." *Id*.

The Court disagrees.

By the Plaintiffs' own admission, they were never "contacted by any Defendant, or any representative of any of the Defendants, to request the use of any of Plaintiffs' [i]mages." Compl. ¶ 86. Plaintiffs never gave permission for the use of their photograph and Defendants never offered to pay Plaintiffs for the use of their photo. *Id*. ¶¶ 87-89. Plaintiffs also do not allege that they modeled or posed for photographs for advertisements, that Defendants accepted their services which then impliedly created a promise from the Defendants to pay the Plaintiffs. As a result, there is no basis for contending that Plaintiffs and Defendants entered into an implied agreement which would now require Defendants to compensate Plaintiffs for their services. *See Burns v. Koellmer*, 11 Conn. App. 375, 380-81 (Conn. App. 1987) ("In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some tacit understanding between the parties." (quoting *Boland v. Catalano*, 202 Conn. 33, 340-41 (Conn. 1987)); *Grici v. Mance*, TTDCV146008673S, 2019 WL 3893027, at *7 (Conn. Super. Ct. 2019) (finding no implied contact between the parties where "[t]he plaintiff never expected to receive compensation for her services, and the defendant never gave the plaintiff any reason to believe that she would be compensated").

Accordingly, Plaintiffs' quantum meruit claim will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** in part and **DENIED** in part**.**

Defendants' motion to dismiss is denied as to the Plaintiffs' claims for false advertising, right to privacy – false light, CUTPA, defamation, and negligence. Those claims will proceed. Defendants' motion to dismiss is granted as to Plaintiffs' claims for conversion and quantum meruit.

**SO ORDERED** at Bridgeport, Connecticut, this 26th day of December 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE